# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FILED BY _ijAR_ D.C.

SEP 0 9 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. PIERCE

Steven E. Greer,

      Plaintiff,

v.

Hilton Worldwide Holdings Inc.;
Christopher Nassetta;
Shaner Hotel Group Limited Partnership;
Lisa Larson;
Robert Hoying;
Brent Crawford;
Noble Park Properties LLC;

      Defendants

Case No.

## COMPLAINT

1. Negligence

2. Invasion of Privacy

3. Breach of Contract

4. CSPA Violation

5. Civil RICO Violation

## JURY TRIAL

# CONTENT

This Complaint is Refiled Per Order by Judge Cannon ........................................................ 1
INTRODUCTION ................................................................................................................. 1
PRO SE RIGHTS in COURT ............................................................................................... 3
PARTIES .............................................................................................................................. 3
    Steven Greer ..................................................................................................................... 3
    Hilton Worldwide Holdings Inc. ..................................................................................... 4
    Christopher Nassetta ........................................................................................................ 4
    Shaner Hotel Group Limited Partnership ........................................................................ 4
    Lisa Larson ....................................................................................................................... 5
    Robert Hoying .................................................................................................................. 5
    Brent Crawford ................................................................................................................ 5
    Noble Park Properties, LLC ............................................................................................. 6
JURISDICTION .................................................................................................................... 7
    Subject Matter Jurisdiction .............................................................................................. 7
    Personal Jurisdiction ........................................................................................................ 7
VENUE ................................................................................................................................. 9
RESPONDEAT SUPERIOR ............................................................................................... 10
FACTUAL ALLEGATIONS ............................................................................................... 11
    RICO Extortion via The Negligent and Illegal Entry of Plaintiff's Room and Invasion of
    Privacy ............................................................................................................................ 15
    The Initial Defamation .................................................................................................... 17
    Negligent Handling of the Incident ................................................................................. 19
    This CoStar Instructional Manual for Hotels to Violate RICO by Extortion ................. 20
    Extortion: the RICO Predicate Acts ................................................................................ 22
    Other Victims of the Extortion ....................................................................................... 23
    Extended-Stay Hotels Might be Illegal Altogether ........................................................ 24
    The Most Recent Defamation and Fraud (violating the CSPA) ...................................... 25
NOBLE PARK PROPERTIES, LLC is an ALTER EGO ..................................................... 26
The INDIVIDUAL DEFENDANTS are not IMMUNE ....................................................... 28
    Piercing the Corporate Veil ............................................................................................. 28
    Crawford and Hoying are Persons Liable Per Ohio Law ................................................ 30
ABOUT the EVIDENCE ...................................................................................................... 31
CHOICE of LAW ................................................................................................................. 31
EFFORTS by PLAINTIFF to AVOID LITIGATION .......................................................... 31
COUNT 1: NEGLIGENCE ................................................................................................... 33
COUNT 2: INVASION of PRIVACY ................................................................................... 35
COUNT 3: BREACH of CONTRACT .................................................................................. 38
    Which State Contract Law Should be Applied? ............................................................... 38
The Elements of a Contract ................................................................................................... 39
    The Express Contract ...................................................................................................... 39
    The Implied Contract ...................................................................................................... 40
    Definition of Breach of Contract .................................................................................... 40
    How the Contract was Breached ..................................................................................... 40
COUNT 4: OHIO CSPA VIOLATION ................................................................................. 44
COUNT 5: CIVIL RICO VIOLATION ................................................................................ 46
    Extortion as a Predicate Act in General .......................................................................... 46

How Predicate Acts Trigger a RICO Violation in General ............................................. 46

The Pattern of Racketeering Required to Violate RICO ................................................ 47

Defendants' Extortion Rises to RICO Violations........................................................... 48

Predicate Act #1 ............................................................................................................. 48

Predicate Act #2 ............................................................................................................. 48

Predicate Act #3 ............................................................................................................. 49

The CoStar Report Proving the Motive of the Extortion............................................... 49

Defendants' Conspiracy to Extort Rises to a RICO Violation: ..................................... 50

The Damages to Plaintiff's Business or Property .......................................................... 51

Plaintiff's Damages Applicable to RICO Statute .......................................................... 52

JURY DEMAND ................................................................................................................. 53

RELIEF ............................................................................................................................... 53

## This Complaint is Refiled Per Order by Judge Cannon

1.      This new Complaint is refiled with permission, per court order.

2.      In *Greer v. Hoying,* No. 24-CV-14258 (S.D. Fla. 2024). (Judge Cannon), the Order

on July 16th, 2025 (ECF 35) stated:

> "Plaintiff's Second Correct Complaint is DISMISSED WITHOUT
> PREJUDICE for lack of personal jurisdiction. The Court expresses
> no opinion on the merits of Plaintiff's claims, which may be raised
> as permitted by law in a proper forum."

3.      This new Complaint adds defendants located within the Southern District of Florida,

thus establishing personal jurisdiction that did not exist in the previous case. Federal

jurisdiction is established by the RICO statute, detailed below.

## INTRODUCTION

4.      This is a Complaint by an individual plaintiff, but it also exposes a wider conspiracy

perpetrated by Hilton Worldwide Holdings Inc. ("Hilton") and the other defendants *inter

alia*.[1] With the intent to evade landlord-tenant laws that should govern their extended-stay

"hotels", the hotels have adopted illegal strategies to scare tenants out of their apartments

(i.e. extort them as a RICO predicate act) so as to avoid local laws that limit the time of stay

for "hotel" guests.

5.      That is what happened here when Defendants fabricated a story about so-called

"altercations" committed by Plaintiff. When that extortion failed, the defendants then moved

on to Plan B in their RICO playbook, so to speak, by calling local police, then Plan C by

asking Plaintiff to move to a new room, and so on. The extortion eventually worked and

Plaintiff relinquished his property (i.e., the right to stay on the room).

6.      While this is not a class action suit, Plaintiff is not alone. Negligence related to hotel

---

[1] Plaintiff believes this to be an even wider scale hotel industry conspiracy, detailed below. CoStar is part of
the conspiracy.

guest privacy is rampant. A lay person using Internet searches can readily find examples.

7.      For example, Plaintiff recently learned of a similar incident happening to a man in Texas staying at another "Home2 Suites by Hilton" (i.e., the same Hilton brand involved in this instant case). In that incident that occurred in 2024, after the Hilton reservations systems supposedly malfunctioned, which was the pretext for the Texas hotel staff the illegally enter the man's room (and other rooms in the same hotel) while he was undressed, forcing him to draw his firearm thinking he was being robbed. This is detailed below as Predicate Act #2 in the RICO count.

8.      Plaintiff found another example of a Hilton hotel guest in Nashville who awoke to find the manager in his room. This is detailed below as Predicate Act #3 in the RICO count.

9.      As another example demonstrating tort violations (as opposed to RICO), several years ago, ESPN sports personality Erin Andrews had her privacy severely violated when negligence committed by the hotels allowed nude video of her to be captured multiple times over a span of years.

10.     The extortion that occurred to Plaintiff in this instant case forced him to relocate while he was in the middle of handling a medical crisis of his father with dementia. It could not have occurred at a worse time. His father subsequently became the victim of improper care in a nursing home and was killed.

11.     As is so often the case, Defendants made matters worse by trying to cover up for their actions. They engaged in a strategy of defamation that violated other torts.

12.     Plaintiff has been lenient with Defendants regarding his demands. They have abused that generosity. Now, Plaintiff has no other recourse but to sue.

2

## PRO SE RIGHTS in COURT

13.     The <u>Judiciary Act of 1789, 1 Stat. 73, 92</u> states, "That in all courts of the United States, the parties may plead and manage their own causes personally or by assistance of such counsel or attorneys", which was signed into law by George Washington.[2] From then on, state and federal courts have permitted *pro se* litigation in civil and criminal cases.[3]

14.     Florida and Ohio lack a statute that specifically addresses the rights of *pro se* litigants. However, the Civil Rules of Procedure address *passim* situations involving *pro se*. In addition, State Supreme Courts have commissioned studies concluding that *pro se* litigants cost the court system less time and effort than lawyers,[4] Florida established the Florida Commission on Access to Civil Justice to assist pro se litigants,[5] and Ohio has a task force that encourages the courts to assist *pro se* litigants.[6]

## PARTIES

### Steven E. Greer

15.     Plaintiff, Steven Greer ("Plaintiff"), is an individual domiciled in Florida since 2019.

16.     Plaintiff is a medical doctor licensed in several states and in good standing. He is also a former Wall Street executive and current advisor to senior counsel for President Trump.

---

[2] George Washington was not a lawyer.

[3] The authors of the Constitution knew that access to affordable and honest lawyers was a problem. Only 28 of the 56 signers of the Declaration of Independence were lawyers. Most of the authors of The United States Constitution were not lawyers, and only 22 out 48 signers of the first version of the U.S. Constitution (i.e., the Articles of Confederation) were lawyers. When the actual Constitution was adopted, only 21 of the 39 convention delegates were lawyers. Also, President Andrew Jackson did not attend law school and yet became a judge and then President of the United States, indicating the acceptance of non-lawyer citizens dealing with legal matters. The aforementioned were all guided by the writings of John Locke, Montesquieu, Sir Edward Coke, and the Magna Carta. Those philosophies champion the individual's direct access to justice without the need for a lawyer.

[4] The Judicial Counsel of California Statewide Action Plan for Serving Self-Represented Litigants

[5] Florida Commission on Access to Civil Justice

[6] Ohio Supreme Court Task Force on Access to Justice: 2015

### Hilton Worldwide Holdings Inc.

17.    Hilton Worldwide Holdings Inc ("Hilton") is a global hospitality brand that, among other things, franchises the Hilton name to hotel owners, such as the other defendants in this instant case.

18.    Hilton does business in Florida, including the Southern District of Florida, in hundreds of locations (more than 400).

19.    Hilton headquarters is located at 7930 Jones Branch Drive, McLean, Virginia 22102.

20.    Hilton is an "enterprise" per the definition in RICO-18 U.S.C. § 1961

### Christopher Nassetta

21.    Christopher Nassetta is the Chief Executive Officer of Hilton Worldwide Holdings Inc.[7]

22.    Hilton headquarters is located at 7930 Jones Branch Drive, McLean, Virginia 22102.

23.    Nassetta Crawford is a "person" per the definition in RICO-18 U.S.C. § 1961

### Shaner Hotel Group Limited Partnership

24.    Shaner Hotel Group Limited Partnership ("Shaner") manages the staff and operations for hotels that franchise brand names, such as Hilton. Shaner operates the Hilton in Dublin, Ohio in this instant case.

25.    Shaner's headquarters are located at 1965 Waddle Road, State College, Pennsylvania 16803, Phone: (814) 234-4460. Shaner is doing business in Florida with physical offices.

26.    Shaner is an "enterprise" per the definition in RICO-18 U.S.C. § 1961. It is registered in Pennsylvania as a Limited Partnership.

---

[7] Nassetta might have resigned by the time of this filing.

4

**Lisa Larson**

27.     Lisa Larson is the "Global Hotel Operations Officer" of Shaner Hotel Group Limited Partnership.

28.     Shaner's headquarters are located at 1965 Waddle Road, State College, Pennsylvania 16803, Phone: (814) 234-4460. Shaner is doing business in Florida with physical offices.

29.     Larson Crawford is a "person" per the definition in RICO-18 U.S.C. § 1961

**Robert Hoying**

30.     Defendant Robert Hoying is an individual who co-owns Noble Park Properties. He is domiciled in Ohio and is a citizen of the United States of America.

31.     Mr. Hoying's personal address is 9233 Hyland Croy Rd Plain City, OH 43064. His business address is 555 Metro Place North, Suite 600, Dublin, OH 43017, and Phone (614) 335-2020.

32.     Robert Hoying does not enjoy immunity from the action of the co-defendant Limited Liability Corporation, which he owns. Actions by Hoying and the improper management of the LLC have pierced the corporate veil.

33.     Hoying is a "person" per the definition in RICO-18 U.S.C. § 1961

**Brent Crawford**

34.     Defendant Brent Crawford is an individual who co-owns Noble Park Properties. He is domiciled in Ohio and a citizen of the United States of America.

35.     Mr. Crawford's personal address is 95 N Riverview St Unit 512 Dublin, OH 43017. His business address is 555 Metro Place North, Suite 600, Dublin, OH 43017, and Phone (614) 335-2020.

36.     Like his business partner Robert Hoying, Brent Crawford also does not enjoy immunity from the action of the co-defendant Limited Liability Corporation, which he owns.

Actions by Hoying and the improper management of the LLC have pierced the corporate veil.

37.     Crawford is a "person" per the definition in RICO-18 U.S.C. § 1961.

**Noble Park Properties, LLC**

38.     Defendant Noble Park Properties, LLC ("Noble Park") is an Ohio corporate entity with an office address listed as at 555 Metro Place North, Suite 600, Dublin, Ohio 43017. It is co-owned by defendants Robert Hoying and Brent Crawford.[8] There are no other Noble Park Properties LLC shareholders. All LLC members and owners are domiciled in Ohio. The agent for this LLC listed with the Ohio Secretary of State ("SoS") is also domiciled in Ohio.

39.     Noble Park Properties, LLC changed its name to Dublin Home 2 Investments, LLC. However, the original LLC formation documents remain under the name of Noble Park Properties, LLC, as detailed below in the section that explains how Noble Park is legally an "alter ego" shell company. Therefore, Noble Park is the proper name for this shell company defendant.

40.     Noble Park is an "enterprise" per the definition in RICO-18 U.S.C. § 1961

---

[8] That information is provided in the letter below from Hilton Domestic Operating Company Inc. to Robert Hoying and Noble Park Properties, LLC.

## JURISDICTION

### Subject Matter Jurisdiction

41.     This Court has federal subject matter jurisdiction due to the RICO Act, 18 U.S.C. §§ 1961-1968 (1970)

42.     18 U.S.C. § 1964(c). "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court…"

### Personal Jurisdiction

43.     Plaintiff's original Complaint, *Greer v. Hoying*, No. 24-CV-14258 (S.D. Fla. 2024), was dismissed without prejudice for lack of personal jurisdiction. *Id.* This new Complaint resolves those deficiencies with the addition of defendants Hilton and Shaner, both of which have physical presences and conduct business in the Southern District of Florida.

44.     FRCP(k)(1) "*In General.* Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant: (A) who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located"

45.     In determining personal jurisdiction matters, federal courts apply the forum state's long-arm statute, per the "minimum contacts" test (established in *International Shoe Co. v. Washington* (1945)), and also ensure compliance with the Due Process Clause of the Fourteenth Amendment.

46.     Fla. Stat. § 48.193(2)(Acts subjecting person to jurisdiction of courts of state), "A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity."

47.     In this instant case, the Court has personal jurisdiction over Defendants because

7

Hilton and Shaner have offices in Florida where they manage numerous hotels properties.

48.     This Court agrees with the above and recently ruled in *Greer v. Hoying,* No. 24-CV-14258 (S.D. Fla. 2024), with the Order on July 16th, 2025 (ECF 35, page 5), that <u>Hilton does business in Florida</u>, "While Home2Suites by Hilton may "do business" in Florida…" Hilton operates hundreds of hotels in Florida.

49.     <u>Regarding whether or not Shaner is doing business in Florida</u>, that same Order stated, "To determine whether a defendant "conducts business in Florida" for purposes of personal jurisdiction, "the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Future Tech. Today, Inc. v. OSF Healthcare Sys.,* 218 F.3d 1247, 1249 (11th Cir. 2000) (per curiam). Florida courts look to: the presence and <u>operation of an office</u> in Florida, the possession and maintenance of a license to do business in Florida, the possession and maintenance of a license to do business in Florida, and the percentage of overall revenue gleaned from Florida client. *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.,* 421 F.3d 1162, 1167 (11th Cir. 2005) (collecting cases)." (see *Greer v. Hoying,* No. 24-CV-14258 (S.D. Fla. 2024)." *Id.*

50.     Shaner and Hilton meet the element of "operation of an office" in Florida by operating numerous hotels in Florida (i.e., 22 locations listed on their website). At least five of those hotels are in the region of this Southern District of Florida Court. Therefore, this Court has personal jurisdiction over Shaner, Hilton and their employees or agents.

## VENUE

51.     This venue in the S.D. Florida is the most appropriate for the refiling of this Complaint given that the original filing was here. If it were to be refiled in a different district, the judge there would likely refer it back to this Court. That is the precedent in federal court.

52.     Venue is a statutory matter (i.e., per congressional act), not a procedural one (i.e., FRCP).

53.     The RICO statute specifies venue: "18 U.S. Code § 1965(a): "Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs."

54.     Defendants meet those elements. Shaner and Hilton are "found" and "transact affairs" in Florida. Crawford and Hoying use Shaner and Hilton as "agents".

55.     Arguendo, if RICO were not used in this case, venue is still proper in this Court pursuant to Title 28 U.S.C. §§ 1391(b)(2) and (3). That general venue statute permits suit in this Fort Pierce court venue because:

> "(2) a judicial district in which <u>a substantial part of the events or omissions giving rise to the claim occurred</u>, or a substantial part of property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be brought as provided in this section, <u>any judicial district in which any defendant is subject to the court's personal jurisdiction</u> with respect to such action."

56.     Per (2), the extortion predicate acts of the RICO claim, or "a substantial part of the events or omissions giving rise to the claim occurred", transpired in the S.D. of Florida (as well as Texas and Ohio, *inter alia*).

57.     Per (3), personal jurisdiction was established above. Therefore, this S.D. of Florida venue is allowed by federal statute.

## **RESPONDEAT SUPERIOR**

58.     The doctrine of *respondeat superior* applies. Defendants Hoying, Crawford, Noble

Park, and Hilton have vicarious liability for their agent, which is Shaner.

59.     Defendants employ the hotel managing company, Shaner. Defendants, individually

and jointly act as the "principal" employer of Shaner, which is the "agent".

60.     Shaner and their staff, as the agents, committed some of the torts in the claims of this

Complaint. These were actions well within the scope of the agent's employment, (i.e., to

manage hotels).

61.     Shaner, the agent, was managing the hotel in a way that benefitted the principal (i.e.,

by collecting money from customers). The actions that harmed Plaintiff (i.e., illegal eviction,

defamation, invasion of privacy, etc.) were performed to benefit the principle (i.e., actions

meant to evade landlord-tenant law and streamline operations legally, *inter alia*).

62.     Shaner's actions were likely explicitly approved by the principle and were certainly

implicitly approved. A jury will decide that.

63.     Shaner is not an independent contractor per the balancing tests of the restatement of

the law treatise.[9] A jury will decide that if it is challenged by Defendants. Also, whether or

not *respondeat superior* applies in this instant case is a matter for a jury to decide as well.

64.     The above facts are summarized by The Supreme Court of Ohio. In *Davis v. The*

*May Dept. Stores, Co.*, 2001-Ohio-1362, the Court ruled:

> It is well-established that in order for an employer to be
> liable under the doctrine of respondeat superior, the tort of
> the employee must be committed within the scope of
> employment. Moreover, where the tort is intentional, \*\*\*
> the behavior giving rise to the tort must be "calculated to
> facilitate or promote the business for which the servant
> was employed \*\*\*."*Byrd v. Faber* (1991), 57 Ohio St.3d
> 56, 58. Significantly, "[t]he willful and malicious

---

[9] https://www.law.cornell.edu/wex/respondeat_superior

character of an employee's act does not always, as a matter of law, remove the act from the scope of employment." *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 330. "'When an employee diverts from the straight and narrow performance of his task, the diversion is not an abandonment of his responsibility and service to his employer unless his act is so divergent that its very character severs the relationship of employer and employee. ***'" (Alterations original.) *Id.*, quoting *Stranahan Bros. Catering Co. v. Coit* (1896), 55 Ohio St. 398, 410. Furthermore, the determination of "whether an employee is acting within the scope of his employment is [generally] a question of fact to be decided by the jury." *Osborne*, 63 Ohio St.3d at 330. It only becomes a question of law when reasonable minds can come to but one conclusion. *Id.*

## FACTUAL ALLEGATIONS

65.     In February of 2022, Plaintiff was forced to relocate to Ohio in order to help his elderly father with dementia. An emergency situation had developed. His father had been abruptly abandoned alone at his Delaware, Ohio house with no caregiver.

66.     On February 7, 2022, looking for a hotel, Plaintiff used the Hilton website to find the Dublin, Ohio property doing business as "Home2 Suites by Hilton" and book a reservation.

67.     Plaintiff had been a frequent customer of Hilton. On the drive to Ohio, he stayed at a Hilton in Memphis, etc. Greer had a very great number of 573,000 Hilton-points at the time, qualifying him for the highest Hilton rewards ranking.



68.     On February 16th, 2022, Plaintiff checked into the Shaner-managed property in Dublin, Ohio, which was doing business as "Home2 Suites by Hilton". Defendants Crawford and Hoying own the hotel property via a shell company LLC called Noble Park. Hilton franchises its name to this property and is on all of the signage.

69.     Plaintiff thought the hotel was owned and operated by Hilton, but it was not. In fact, it is a Crawford-Hoying property operated by their agent, Shaner.

70.     Upon checking in, there were no signs that explained the property was owned and operated by entities other than Hilton.

71.     Plaintiff gave the desk staff his credit card, and paid in advance for one week an amount of $1,064.62, thus executing the contract with all Defendants. The original reservation made through Hilton did not require upfront payment.

72.     Plaintiff asked the front desk when checking in if he could stay longer than five days and was told that he would be able to do so. Plaintiff told the staff that he did not know how

12

long he would stay, indicating an indefinite period. When Plaintiff renewed his stay, which was approximately every two weeks, he was never told that he would have to leave at some point.

73.    Of note, Plaintiff was never informed upon checking in that Ohio law limits "transient" hotel stays to 270-days. If guests stay longer than that, then the "transient hotel" is classified as an apartment complex, affecting city and county zoning laws, etc.

> "**Ohio Rev. Code Section 3731.04** | Types of accommodations offered by hotels- ...
>
> A transient hotel also may allow a guest to stay in a transient sleeping room for a continuous period of two hundred seventy days or less if the transient hotel satisfies the requirements specified in section 3731.041 of the Revised Code."

74.    Plaintiff was never informed that the amount of time he could stay at this hotel was limited.

75.    When Plaintiff's hotel stay lasted longer than 30-days, <u>he became a tenant just like an apartment dweller</u> and enjoyed the protection of laws against frivolous harassment from a landlord or unjust eviction. Had he stayed longer than 270-days, Ohio law is clear that the property would then have become a residential apartment (see footnotes 12-15 below).[10]

76.    The General Manager of this Shaner property at the time was a man named Chaz Le ("Chaz"). Plaintiff was on good terms with Chaz during his entire stay.

77.    The only notable problem with Plaintiff's stay was a fairly routine complaint about the housekeeping staff being reluctant to completely change the sheets, make the bed, etc., which were required by law. The neglect of Plaintiff's room exceeded the standard post-

---

[10] To Plaintiff's knowledge, this instant case is the first one to expose, in Ohio at least, this common hotel industry business model of extended-stay "hotels" as actually being nothing but apartment complexes that skirt landlord-tenant law.

COVID hotel industry policy of merely ending daily housekeeping. Even during the once-weekly visits, the Home2 Suites Shaner <u>staff were trying to avoid changing the bed linen, towels, etc</u>.

78.     Plaintiff also noticed other signs of poor management. For examples, the ground-floor gym had a large array of dumbbells stolen because of the lax security. Also, <u>the carpet in the hallway of the lobby was badly stained</u> because the staff did not place mats on the floor to collect the water that dripped from wet guests exiting the indoor swimming pool (chemicals in the pool caused stains).

79.     In addition, a front desk employee engaged with Plaintiff in odd and inappropriate conversations, often telling him her very personal stories.

80.     Plaintiff stayed in the hotel from February through August (seven-months) without any incident to his knowledge. <u>No one from the hotel had ever spoken to Plaintiff about any sort of alleged misconduct</u>. Defendants have never made any allegations that Plaintiff was informed of any problems. If a real "altercation" worthy of eviction had taken place, it would have been the fiduciary responsibility of the General Manager, Chaz, to notify Plaintiff immediately.

81.     Then, unbeknownst to Plaintiff, Shaner made changes to the management of the Home2 Suites in September of 2022. <u>They fired Chaz</u> and replaced him with a roving regional manager named Morris Siyman ("Siyman").

82.     Siyman held meetings with his staff and took inventory of the long-term-stay guests. Plaintiff had been staying in the hotel for approximately 210-days. Thus, the 270-day limit for guests, per Ohio law, was approaching. Plaintiff was unaware of this time limitation to his stay.

83.     Plaintiff believes that the manager of housekeeping defamed him to this new

management staff. That was an act in retaliation for his previous complaints about housekeeping skipping his room.

**RICO Extortion via The Negligent and Illegal Entry of Plaintiff's Room and Invasion of Privacy**

84.     On September 12th, 2022, <u>before</u> Plaintiff was aware that Mr. Siyman was the new manager and Chaz had been fired, he received a knock on his hotel room door around 10:00 AM by a man claiming to be housekeeping. It was Mr. Siyman, the new acting manager, who was defrauding Plaintiff by lying about his job title. In fact, he was not "housekeeping" at all.

85.     Plaintiff, who was still in bed and disrobed, said through the closed door of the hotel room that he did not wish to have housekeeping do service at that time. But the man persisted on knocking.

86.     By this time, Plaintiff suspected a criminal intrusion was about to happen and began filming the door from his bed.[11] The conversation went as follows:

> Siyman: Door knocks- "This is housekeeping."
>
> Greer from inside the room: "No thank you. Come back please."
>
> Door opens with Siyman and hotel employee woman standing next to him staring at Greer lying in bed. Lights are out in the room. Curtains are shut.
>
> Greer: "What's going on here?"
>
> Siyman: "I am the regional manager…they called me…the hotel called me…the management…we are going to have to ask you to leave…"

---

[11] Plaintiff feared for his safety much like the man in the Texas hotel did when he pulled a gun on the intruders.

Greer: "For what reason?"

Siyman: "There has been some altercation that was being aware to and I want to do this the right wat Mr. Gry [sic]"

Greer: "I'm in the bedroom. There was no altercation. I have no idea what is going on."

Siyman: "A couple of times in the past few weeks…"

Greer: "Let me get some clothes on. I'll come down and talk to you."

Siyman: "OK. I'll be here another 30-minutes."
(door closes)



87.     Plaintiff was greatly alarmed and suffered severe mental anguish, embarrassment, and humiliation from this illegal break-in and trespassing into his apartment. In fact, this litigation, years later, is evidence of those lingering bad memories.

88.     Plaintiff asked if they could continue the bizarre encounter over the phone rather than in person. Mr. Siyman agreed, went downstairs, and Plaintiff called the front desk. He

spoke to Siyman.

89.     This incident was an act of illegal entry by a landlord.[12] Hotels in Ohio, and most other states, that allow guests to stay longer than 30-days are not exempt from landlord-tenant law[13,14,15]. In this instant case, the room in which Plaintiff stayed for many months was an extended-stay (i.e., not transient) property with suites that have kitchens, etc. They are normal apartments with no contracts or clauses that tell the guests they are <u>not</u> protected by Ohio landlord-tenant law. <u>A reasonable person and jury would assume that they are apartments and not transient hotels.</u>

90.     Defendants should be well aware of these hotel and landlord-tenant laws. Therefore, it was an act of negligence for them to illegally enter Plaintiff's room and invade his privacy without a 24-hour notice and no pretext of an emergency.

**<u>The Initial Defamation</u>**

91.     A formal count of defamation is not part of this Complaint because Ohio case law does not apply the "continuing violation" doctrine to defamation, making most of the defamatory actions beyond the statute of limitations. However, this tort damage is still relevant to the other counts.

---

[12] "Ohio R.C. Section 5321.04 | Landlord obligations.(A)(8)" "Except in the case of emergency or if it is impracticable to do so, give the tenant reasonable notice of the landlord's intent to enter and enter only at reasonable times. Twenty-four hours is presumed to be a reasonable notice in the absence of evidence to the contrary."

[13] Ohio landlord-tenant law, O.R.C. 5321.01(C)(3), does exempt "hotels and motels" from the definition of "residential premises" governed by landlord-tenant law, but also states, "and other similar facilities where circumstances indicate a transient occupancy", implying that "hotel" in that law refers to short-term stays under 30-days. The Ohio definition of "transient stay hotel" is, per O.R.C. Section 3731.01, ""Transient hotel" means any structure...a place where sleeping accommodations are offered for pay to transient guests for a period of thirty days or less, including...a hotel, motel, motor hotel, lodge, motor lodge, bed and breakfast, or inn." Ohio Rev. Code Section 3731.04 defines "transient hotel" as a place allowing guests to stay under 270-days.

[14] This conflicting law in the above footnote is why it is also common law in Ohio that a hotel guest staying longer than 30-days is considered to be a permanent tenant and not a "transient" one. The Dublin Police, in this instant case, and many other police forces in Ohio, will not evict a guest if they have stayed longer than 30-days, unless there is a landlord-tenant court order. Ohio law makes it clear that any guest staying over 270-days is not a "hotel" guest in a transient property. The property residential subject to landlord-tenant law.

[15] Plaintiff is not using these landlord-tenant laws for any stand-alone count or claim. These Ohio laws are noted to clarify that Defendants did not have the right to evict plaintiff, without any prior notice, and without resorting to the courts. Therefore, their actions were negligent.

17

92.     Plaintiff called the front desk within minutes of the hotel room invasion and spoke to Siyman. Plaintiff was speaking normally during this call, but Siyman kept accusing him of yelling and being aggressive. Plaintiff believes he was spinning a tale for others in the office to hear so as to justify his attempt to evict Plaintiff. His actions were malicious and knowingly false.

93.     Mr. Siyman said that there had been "multiple altercations in the past few weeks". Third-parties in the office heard this. Plaintiff had no idea what he was talking about. Siyman later stated that there was just one "main incident", but refused to provide any details whatsoever.

94.     <u>Siyman then admitted that he actually personally knew</u> nothing about the alleged "altercation" and was simply told by "management" that a "decision has been made" to evict Plaintiff.

95.     Third-parties in the office sitting by Siyman heard these defamatory accusations that were published.

96.     Siyman then demanded that Plaintiff leave within "24-hours", or "by tomorrow morning."

97.     Siyman had no interest in hearing Plaintiff's side of the story (Notably, Plaintiff still does not know what alleged incident occurred despite numerus conversations with Defendants' lawyer, etc.).

98.     On the evening of September 12th, Plaintiff called the Dublin, Ohio Police and spoke to a supervisor. The Dublin Police Officer told him that Mr. Siyman had already called them trying to use police to evict Plaintiff and the police refused. <u>Therefore, Plaintiff was portrayed by Siyman to the police as a criminal,</u> which is *per se* defamation.

**Negligent Handling of the Incident**

99.     The Dublin Police officer provided to Plaintiff an interesting fact. He said that their department had received frequent complaints from guests about this hotel management. Therefore, Defendants were negligent for not addressing what appears to be a recurring problem.[16]

100.    Plaintiff researched the ownership of the property and learned of the Shaner Group, which is a hotel management company employed by the Hoying Dependents.

101.    On September 13th, 2024, he called Lisa Larson ("Larson"), who is listed as the "Global Hotel Operations Officer" for Shaner.[17] Larson mentioned rather out of the blue that Ohio law limits the length of stay of guests to 270-days. Plaintiff believes that this slip of the tongue explains one motivation for Shaner Group's actions.

102.    Plaintiff explained the details above. Larson was supposed to research the matter and call back. She never did. That was yet another act of negligence by Defendants.

103.    Larson never approved the continued stay of Plaintiff or reversed the actions of Siyman. As far as Plaintiff knew, the hotel was still trying to evict him.

104.    Then, on September 18th, 2022, the hotel told Plaintiff that they needed to move him to a new room. The act seemed like a nefarious trap. It is a common scam of hotels to use "room shuffling" to maintain the "transient" status of the guests.[18]

105.    Out of fear and under duress that this proposed room shuffle would expose him to more violations by the hotel staff, Plaintiff moved out of the (Crawford-Hoying owned, Hilton-branded, Shaner-managed) hotel property. He relocated into a nearby hotel on September 18th.

---

[16] During discovery, Plaintiff plans to subpoena the Dublin Police.
[17] Larson is aware of this litigation that mentions her name.
[18] https://www.yashlaw.com/practice-areas/consumer-protection/residential-hotels-illegally-evicting-guests/

106.   On September 23rd, 2023, having not heard back from Larson, Plaintiff called her again. He was surprised to learn that Larson thought that the problem was resolved simply because Plaintiff had moved out on his own without being legally evicted.

107.   Plaintiff requested a refund for the amount he had paid to Defendants. He received no reply.  Again, Defendants' lack of communication was negligence and a violation of her fiduciary duty as a "global" manager.

### This CoStar Instructional Manual for Hotels to Violate RICO by Extortion

108.   Plaintiff researched his incident to see whether or not others had experienced similar violations. What he learned is that the hotel industry had schemed of ways to handle the burgeoning population of extended-stay Americans who were driven out of their homes due to the COVID lockdowns and high unemployment.

109.   CoStar is a large data and analytics company serving the real estate industries, including the hotel industry. It is publicly traded and used by most major hotel companies. It is to commercial real estate companies as Bloomberg L.P. is to Wall Street equities traders.

110.   The CEO of Hilton, Christopher Nassetta, is on the board or directors of CoStar.

111.   On CoStar's website[19] is a page on: How Hoteliers Can Avoid Turning Long-Term Guests Into Tenants- Pandemic Led to More Potential Hotel Landlord-Tenant Relationships. It serves as a *de facto* manual on how to commit RICO predicate acts so as to skirt landlord-tenant laws, *inter alia*.

112.   CoStar explains how to us extortion for smoking out troublesome tenants. The article (Full article at Ex. 2), written on July 26th, 2021 states, *inter alia*:

> "Throughout the COVID-19 pandemic, hoteliers have wanted guests to stay at their properties, especially guests who extend their stays. While hoteliers certainly welcome a guaranteed source of

---

[19]      https://www.costar.com/article/1115067271/how-hoteliers-can-avoid-turning-long-term-guests-into-tenants

revenue when demand is down, operators do need to be aware of how and when guests become tenants and hoteliers become landlords.

Knowing the Law

The main issue is whether and when the landlord-tenant code applies, said Tara Lattomus, attorney at Eckert & Seamans. **Many jurisdictions set a 30-day time frame, so if a guest stays past that threshold, they would be considered a tenant.**

Removing Unwanted Guests, Tenants

**Hoteliers can use** the unlawful detainer **process in court** to reclaim a guestroom through eviction...While this process removes the unwanted guest, **it's a last resort.** "If you're finding yourself in that place, you already lost," he said.

**Arguably, the only way to break the stay is by having the guest move out of the guest room before tenancy is established.**

Even if a guest is paying, hoteliers have the right to remove a guest if they are causing other sorts of problems, such as making excess noise or damaging the guest room, he said.

**As a hotel guest, a person doesn't have the same property rights they would as a tenant,** Lattomus said. That means hoteliers can take actions to remove a guest if the situation warrants it without needing to follow their state's eviction process they would if trying to remove a tenant.

**For instance, hoteliers can lock a guest out of a guest room** by deactivating the key card, she said. The hotel could then store the person's belongings until they are ready to remove the items. If the person refuses to leave, **the hotel can call the police to remove a guest.**

Pandemic Complications

One type of long-term guest that hoteliers have served is one who was forced to move into a hotel because of losing a home for any number of reasons during the pandemic. **Hoteliers don't want these guests to establish tenancy because these guests are coming in with potentially few financial resources** to begin with, Kravetz said."

113.   Many of those recommendations above are flagrantly illegal. It is remarkable that

CoStar would publish such an article.

114. The article openly admits to the intention of evading landlord-tenant laws and courts. CoStar explains how extortion techniques can be used to move the hotel guests around, preventing them from staying on one room for more than 30-days, which prevents them from becoming a tenant.

115. Also, locking a guest out of a room is flagrantly illegal, as is calling police to scare people into leaving.

116. The CEO of Hilton, Mr. Nassetta, being a CoStar board member, is fully aware of this *de facto* manual for committing RICO.

**Extortion: the RICO Predicate Acts**

117. Extortion is defined by the Hobbs Act (18 U.S.C. § 1951) as, (a) obtaining property from another person, (b) by wrongful means to gain consent, (which is wrongful use of force, violence, or fear). The CoStar article lists "wrongful means" for scaring people into leaving their rooms (i.e., their property).

118. In this instant case, Defendants used several of those illegal tactics against Plaintiff, which are straight from the CoStar manual for RICO. They tried to move Plaintiff to another room in order to revoke his extended-stay "tenant" status. They also made a frivolous and malicious call to the Dublin Police. The initial act of shocking Plaintiff by opening his locked door without his permission was another wrongful means.

119. Defendants committed extortion to other interstate victims. Those are the multiple predicate acts required to prove a RICO violation (see RICO section below).

120. Because it is a corporate policy, there is a good chance of Defendants committing extortion, and conspiracy to extort, in the future.

**Other Victims of the Extortion**

121.    Plaintiff is not alone in being a victim of Defendants' extortion. Without the benefit yet of undergoing discovery, Plaintiff has already learned of other examples of similar incidents of Hilton hotel managers breaking into rooms.

122.    For example, an X.com account named @BrokenTruthTV tweeted on July 9th, 2024 how he was staying at another Home2 Suites by Hilton in Amarillo, Texas when management broke into a room. He had no clothes on and was forced to draw his firearm thinking he was being robbed.



**Broken Truth** ✪
@BrokenTruthTV

Hotel system glitched and crashed in Amarillo. Our room (last available) was somehow locked from the inside. The staff opened the door and there was an armed naked dude in it! The system registered the room as empty!

1:08 AM · 7/9/24 From Earth · **1.4K** Views

123.    Plaintiff called the Amarillo Hilton hotel and learned that numerous guests had experienced the same violations. Per the hotel employee on the phone, the Hilton computer reservation system had crashed and the management thought it was acceptable to open hotel rooms without permission in order to free up the room for new guests.[20] The managers needed to process and check in newly arriving guests. They used extortion and the same tactic of entering rooms, without calling the room first, so as to create fear and get the tenants to vacate the hotel. The shock of seeing a hotel manager enter a room (and having to pull a

---

[20] Plaintiff plans to subpoena records about this series of incidents.

gun in self-defense) often results in the guest giving up their property (i.e., the right to stay in the hotel room).

124.    As another example, in 2023, a Hilton Hotel manager was arrested for breaking into a guest's room at the Hilton Nashville, Tennessee Downtown Hotel.[21]

125.    Regardless of the manager's intent (the case is ongoing in court), he was hired by a Hilton hotel, despite having a criminal background, and was inadequately trained by Hilton Hotel. This ongoing lawsuit further establishes a pattern by Hilton.

**Extended-Stay Hotels Might be Illegal Altogether**

126.    The problem for Defendants is that their entire business model of offering extended-stay hotel services is likely illegal. They are trying to offer extended-stay "hotels", but are actually operating apartments with "tenants" who enjoy the protections of landlord-tenant laws. To protect that illegal business enterprise, they violate RICO with predicate acts of extortion.

127.    Rather than use state courts for proper evictions, which would expose the unlawfulness of their so-called "hotels", Defendants use scare tactics instead. They first will abruptly surprise guests by entering their room with demands for immediate evictions based on fabricated vague allegations of "altercations". When that "shock and awe" strategy fails, Hilton and Shaner's managers then turn to local police for help. When that does not work, they try to relocate the tenant into a new room (i.e., "28-day shuffle"[22]) to reclassify them as a transient guest that is no longer protected as a long-term tenant.

128.    Plaintiff is not speculation about this. It is spelled out in the CoStar article.

---

[21] *Brennan v. Hilton*, No. 23C928 (Tenn. Cir. Ct. Davidson Cnty. 2023), case is proceeding to trial in 2025
[22] For example, "City Warns Hotels to Halt the '28-Day Shuffle'" LA Times, 2004.
https://www.latimes.com/archives/la-xpm-2004-jan-25-me-warning25-story.html

**The Most Recent Defamation and Fraud (violating the CSPA)**

129.    Fraud committed by Defendants is also "unfair and deceptive" per the R.C. §1345.02

Consumer Sales Practices Act, which is a claim here.

130.    In April of 2024, Plaintiff drafted a Complaint and contacted various lawyers or

officers of Defendants. Settlement negotiations ensued.

131.    On June 6, 2024, Plaintiff received a call from an unknown woman who was

reluctant to give details of the nature of her call. Her name was Sarina Denman and works

for The Cincinnati Insurance Company. However, she was very suspicious and dodgy. She

refused to state which defendant initiated her investigation.

132.    An email after the call from Denman stated,

> "As previously stated Hilton and Shaner are Additional
> Insureds. I am reaching out on behalf of Bridge Park Hotel
> LLC, not on behalf of Hilton. We are still investigating this
> matter."

133.    In no way did Plaintiff initiate an insurance claim. He simply answered a phone call

from Ms. Denman.

134.    On June 17, 2024, Denman emailed Plaintiff a letter in the form a claims denial. The

letter stated:

> "...We have attempted to appraise fairly and properly all of
> the information available to us regarding the damages. Being
> guided by these facts, it is our conclusion that there is no
> evidence that our insured was negligent or legally responsible
> for your claimed damages. As such, we must respectfully
> deny your claim. This declination is based upon information
> presently available to us. Should you have additional
> information that you feel may affect the liability position of
> The Cincinnati Insurance Company, please forward it to the
> undersigned for further review..." (emphasis added)

135.    Plaintiff immediately became alarmed after reading the fraudulent letter. It was

clearly trying to misrepresent the facts as if Plaintiff were a claimant. He sent a cease-and-

desist email to Denman to correct the lies, but the letter and was ignored.

136.   On June 20, 2024, Plaintiff spoke to a lawyer representing Hoying[23], Marc Kessler of the Taft law firm, and he denied that his client initiated a claim with Denman's company. The lawyer representing Shaner also denied any involvement. Plaintiff believes that Mr. Kessler was lying.

137.   Clearly, Defendants were involved in this incident, are now falsely denying it, and knowingly misleading Plaintiff. That is "unfair and deceptive" per the R.C. §1345.02 Consumer Sales Practices Act.

138.   The Cincinnati Insurance Company's letter is also *prima facie* proof of defamation committed by Defendants. Defendants, while in their Ohio locations, "published" to Ms. Denman (a third party) false information about Plaintiff that led The Cincinnati Insurance Company reviewer, Ms. Denman, to view Plaintiff as a liar. There is no other explanation for the letter denying the "claim".

## **NOBLE PARK PROPERTIES, LLC is an ALTER EGO**

139.   Noble Park Properties, LLC was established as an Ohio LLC in 2015, per the Ohio SoS online database of companies. In 2019, Noble Park changed its name to Dublin Home 2 Investments, LLC for unknown reasons. Defendant and co-owner Brent Crawford signed the change-of-name form that is filed with the Ohio SoS. He is listed as the "Authorized Representative". However, there are no corporation filing documents under the name of Dublin Home 2 Investments, LLC. The LLC entity remains under the original articles of organization for Noble Park. Therefore, Dublin Home 2 Investments, LLC is to be viewed as a "doing business as" name and not a separate entity or defendant.

---

[23] It was never made clear which party Mr. Kessler actually represented. He refused to explain. When an offer to settle was made, Mr. Kessler communicated it and insinuated he represented Crawford-Hoying, Hilton, and Shaner.

140.    In 2015, Noble Park was the business entity that became the grantee (i.e., owner) of the deed for the hotel property where some of the actions core to this Complaint occurred (i.e., the Home2 Suites by Hilton located at 5000 Upper Metro Place, Dublin, Ohio, 43017). There is no evidence that Noble Park is an actual real estate management company. The hotel is managed by Shaner; a company hired by the Hoying and Crawford persons.

141.    The original listed company agent in the 2015 Noble Park Properties, LLC SoS filings is John A. Gleason, who was an Ohio lawyer at the time with an address listed on the LLC documents as 141 South High Street, Suites 2800-3200 and a phone number that goes straight to voicemail at (614) 296-1281. Phone messages left are not returned.

142.    Now, The Columbus Bar Associations lists him as having only a P.O. Box linked to a solo practice at Gleason Law Office LLC, PO Box 768, New Albany, OH 43054-0768 (i.e., a different city than Columbus and the South High Street address). His email is listed as jgleason@gleasonlawofficellc.com. An email on August 16, 2024 from Gleason to Plaintiff lists his address as Gleason Law Office LLC, 4200 Regent Street, Suite 200, Columbus, Ohio 43219 (i.e., different from what is listed with the SoS). An Internet search of Mr. Gleason reveals nothing but lawyer spam ads [24], etc. Mr. Gleason has little presence on the Internet that is noteworthy, which is unusual for most practicing lawyers.

143.    On August 27th, 2024, after the Complaint was filed, Mr. Gleason finally replied via email stating, "I no longer represent that entity. Thanks.", referring to Noble Park. However, as of the date of this SAC filing, there is no newly appointed agent registered with the SoS.

144.    According to new 2022 Ohio law governing LLC's [25], Mr. Gleason has not met the

---

[24] For example, https://www.lawyers.com/columbus/ohio/john-albert-gleason-esq-24659051-a/
[25] Ohio Revised Limited Liability Company Act (Ohio Rev. Code §§ 1706.01-1706.84)(E)- If the agent described in division (A) of this section changes the agent's address from the address stated in the records of the secretary of state, the agent or the limited liability company or foreign limited liability company shall file forthwith with the secretary of state, on a form prescribed by the secretary of state, a written statement setting forth the new address.

requirements of an agent to maintain a valid LLC. He has changed addresses numerous times since the 2015 SoS filing and has not updated the SoS. His phone number on file with the SoS is also nonfunctioning.

145.   Therefore, Noble Park Properties, LLC is not in compliance with Ohio law. It was always created as an "alter ego" shell company.

## The **INDIVIDUAL DEFENDANTS are not IMMUNE**

146.   Crawford and Hoying do not enjoy immunity from the actions of their LLC corporate entity, Noble Park for several reasons. First, that corporate veil has been pierced. Noble Park Properties, LLC is an alter ego to the persons and organized to protect those individuals from the fraudulent business conducted by the hotel that it owns. Secondly, Ohio law governing LLC management specifically makes individual owners liable for monetary relief for a violation of their duties.

### Piercing the Corporate Veil

147.   In Florida law, the case of *North American Clearing v. Brokerage Computer Sys.*, 666 F. Supp. 2d 1299 (M.D. Fla. 2009), "Piercing the corporate veil in Florida traditionally requires two elements: first, "the corporation is in actuality the alter ego of the stockholders," and second, "it was organized or after organization was employed by the stockholders for fraudulent or misleading purposes." *Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So.2d 1114, 1120 (Fla.1984)."

148.   In Ohio law, the case of *Belvedere Condominium Unit Owner's Assn v. RE Roark Cos., Inc.*, 67 Ohio St. 3d 274, 617 N.E.2d 1075, 617 N.E. 1075 (1993) ruled,

> "(The Court) address the alter ego doctrine and the ability of a plaintiff to "pierce the corporate veil" in order to reach an individual shareholder. "That a corporation...is a mere fiction...may be disregarded." Thus, the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so

complete that the corporation has <u>no separate mind</u>, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner <u>as to commit fraud</u> or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

149.    Noble Park is a shell company created as an "alter ego" sham for Hoying and Crawford. There is no sign of it being a real business. It is "fiction". Noble Park has no website or way to contact it other than an obscure "agent" listed with the Ohio Secretary of State ("SoS"), and that agent, Mr. Gleason, no longer represents the LLC. Noble Park has no "separate mind". It was created to "fraudulently" give the appearance or corporate protection to Hoying and Crawford. The property owned by Noble Park, Hoying, and Crawford caused the injuries detailed in the Counts below.

150.    The agent listed with the SoS, John A. Gleason, does not respond to phone calls. As detailed above, his address listed on the SoS database [26] is outdated and does not match his current address[27]. Mr. Gleason appears to be a solo practice lawyer catering to real estate clients who need to create shell companies as legal shams. His operations are as shady as they come. As mentioned above, he also denies any current relationship with Noble Park, but no new agent has been registered with the SoS.

151.    <u>For those reasons, Noble Park is the definition of an alter ego</u>. There is no difference between the owners and the actions of the shell company. The Noble Park LLC obfuscates the human ownership from the public eye and the numerous disgruntled customers of the Home2 Suites hotel that it owns. That <u>misleads</u> the public.

152.    Noble Park's "Home2 Suites by Hilton" hotel conducts business with fraud as its

---

[26] 141 South High Street, Suites 2800-3200, Columbus, Ohio 43215
[27] An August 16, 2024 email from Gleason to Plaintiff listed his address as 4200 Regent Street, Suite 200 Columbus, Ohio  43219

*modus operandi.* As detailed above, it is actually an apartment complex that avoids landlord-tenant laws by masquerading as a hotel. That is fraud. Noble Park was "organized by the stockholders for fraudulent or misleading purposes."

**Crawford and Hoying are Persons Liable Per Ohio Law**

153.    According to Ohio Revised Limited Liability Company Act (Ohio Rev. Code § 1706.311(E)- Duties of a manager to a limited liability company and its members.): "A manager shall be liable for monetary relief for a violation of the manager's duties under division (C) of this section only if it is proved that the manager's action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the limited liability company or undertaken with reckless disregard for the best interests of the company."

154.    The allegations of this Complaint, which are to be taken as true at this stage of the pleadings, paint a picture of two individual defendants who are the LLC managers (i.e., Hoying and Crawford) creating a shell company LLC as an alter ego to provide a buffer from the fraudulent business practices of the hotel owned by Noble Park Properties, LLC. Those are deliberate and intentional acts that are not in the best interest of the LLC.

155.    Furthermore, Plaintiff has been in extensive communication with Hoying, Crawford, their agent (Shaner), their Ohio lawyer (Mr. Kessler), and their joint venture partner (Hilton). The underlying facts of the grievance (the invasion of privacy, failure to obey Ohio landlord-tenant laws, etc.) have never been disputed by Defendants, and yet Defendants have refused to mitigate damages by failing to negotiate with Plaintiff in good faith.

156.    If Noble Park were a publicly traded company, shareholders would have a strong case against Hoying and Crawford for violating their fiduciary duties.[28] For those reasons

---

[28] Plaintiff is an expert on publicly traded companies having worked as an analyst and portfolio manager for the biggest Wall Street banks and hedges funds.

too, Hoying and Crawford have <u>deliberately</u> acted with <u>reckless disregard</u> for the best interests of the company, thereby violating Ohio LLC law.

## ABOUT the EVIDENCE

157.    At no point have any of the facts alleged in this Complaint been disputed by Defendants or their lawyers. If Defendants were to commit perjury to this Court and dispute these facts, Plaintiff has ample evidence that can be produced.

## CHOICE of LAW

158.    The Erie Doctrine applies to federal courts. "Federal courts sitting in diversity must apply the substantive law of the forum state. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)", *Braddock v. Orlando Regional Health Care System,* 881 F. Supp. 580 (M.D. Fla. 1995). The Florida law that determines which state law should be applied is referred to as the "most significant relationship" test. *Bishop v. Florida Specialty Paint Co.,* 389 So. 2d 999 (Fla.1980).

159.    "Under this test, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless some other state has a more significant relationship to the occurrence or the parties, in which case the other state's law applies. Restatement (Second) of Conflicts of Laws § 146 (1971). *Florida Steel Corp. v. Whiting Corp.*, 677 F. Supp. 1140 (M.D. Fla. 1988).

160.    Therefore, Ohio law is what Plaintiff believes should govern the elements required for the claims in this instant case.

## EFFORTS by PLAINTIFF to AVOID LITIGATION

161.    Plaintiff has attempted to resolve this matter for three years. He was ignored by multiple layers of managers and agents. In-house lawyers for the Hilton corporation replied by showing Plaintiff a copy of a letter that they had sent to Robert Hoying, ordering him

31

personally to resolve the matter (see image below).

162.     However, Robert Hoying continued to ignore the problem. When Plaintiff searched court records and found attorneys on other cases related to Defendants, he was eventually referred to a lawyer at Taft law named Marc Kessler.

163.     Mr. Kessler failed to address the grievances in good faith. It was clear he had put little effort into researching the facts or reading a draft Complaint. Eventually, Mr. Kessler made a written offer that was designed to be insulting.



## **COUNT 1: NEGLIGENCE**

164.    Plaintiff realleges as though fully set forth at length, and incorporates herein by reference, all of the allegations in ¶¶ 1-163 and statements made above and contained herein.

165.    Defendant Noble Park Properties, LLC is a shell company and alter ego of the individual defendants, Hoying and Crawford, who act in unison as co-owners and co-managers. Therefore, allegations in this Count apply to all Defendants.

166.    All Defendants are responsible for their agent, Shaner Group, that staffs and manages the property called Hilton Home2 Suites in Dublin, Ohio. "Hilton Domestic Operating Company Inc. or its subsidiaries" and/or "Hilton Worldwide Holdings Inc.," are also agents and/or joint venture partners of/with Defendants.

167.    In Ohio law, "To prevail on a negligence claim, Plaintiffs must demonstrate the traditional negligence elements of duty, breach, causation, and injury. *See Briney v. Sears, Roebuck & Co.,* 782 F.2d 585, 587 (6th Cir.1986)" *McConnell v. Cosco, Inc.*, 238 F. Supp. 2d 970 (S.D. Ohio 2003). These elements have been met (see underlined sections below).

168.    The statute of limitations for the tort of negligence is two-years. This Complaint has been filed in less time. The original complaint filed in this court was in 2024.

169.    Defendants (Robert Hoying, Brent Crawford, and Noble Park Properties, LLC), acting as the "principle" employers, individually, and by and through its agents and/or joint venturers (Hilton Domestic Operating Company Inc. is the joint venture and Shaner Hotel Group LP is the agent), had a duty to exercise reasonable and ordinary care, and caution in and about the ownership, management, maintenance, supervision, control and operation of the Dublin, Ohio "Home2 Suites" and its reservation system and each of its employees, agents, servants and independent contractors, all to the benefit of guests, patrons, business invitees, and persons like Plaintiff.

33

170.    Defendants, by and through their agents, employees, servants, and/or independent contractors, breached that duty and were negligent in their acts and/or omissions by, (a) allowing incompetent managers (i.e., Shaner staff) to run the business operations, resulting in a breaking and entering of Plaintiff's room while he was in bed and undressed, while a female employee stood and witnessed the actions (see ¶¶ 84-90), (b) by engaging in defamatory attacks against Plaintiff, (c) and by allowing substandard housekeeping and hotel maintenance that violated Ohio law [29] (see ¶¶ 77-79).

171.    They allowed this despite having well known problems with their Shaner agents (i.e., Shaner fired the managers (see ¶¶ 81-82), as an admission of guilt, and the Dublin Police stated that there have been many complaints about the property.).

172.    When Plaintiff tried to mitigate damages by calling a senior manager, Larson, she negligently failed to return calls or take any other actions (see ¶¶ 99-107).

173.    According to Mr. Siyman, it was Larson who ordered him to remove Plaintiff from his room, yet Larson never visited the property, or even the State of Ohio, and never interviewed Plaintiff. Her decision was made negligently.

174.    Shaner staff was negligently ignoring landlord-tenant laws of Ohio by trying to harass Plaintiff into leaving rather than use the recourse of the courts (see footnotes 12-15).

175.    Defendants, the principles, are liable for the actions of Shaner, *et al* (the agents).

176.    As a direct and proximate cause of the breach of duty by the above-said conduct of Defendants, Plaintiff has suffered and continues to suffer actual harm from, including but

---

[29] O.R.C. Section 3731.12(A) "Beds and bedding" states, "…All sheets and pillow slips used on any furniture designed for sleeping shall be white or off-white in color and shall be washed daily if requested by a guest…" Section 3731.13 states, "All bedding used in any hotel must be thoroughly aired, disinfected, and kept clean…" There were never special Ohio laws passed during the COVID era to exempt Defendants from cleaning the room. *Arguendo*, even if there were, the Ohio Department of Health rescinded all COVID orders in 2021, long before Plaintiff checked in the next year in 2022. O.R.C. Section 3731.13 states, "…All floors, carpets, and equipment in hotels, and all walls and ceilings shall be kept in sanitary condition."

not limited to, severe and permanent emotional distress, embarrassment, and a loss of earning capacity. Plaintiff has not stayed in a hotel since the incidents in this case as a result of the severe emotional trauma. Plaintiff suffers insomnia and flashbacks in his home. Being forced to file this Complaint in a public forum is embarrassing and furthers the severe emotional distress.

177.    WHEREFORE, Plaintiff Steven Greer prays for judgment in his favor and against all Defendants in an amount in excess of $2,000,000 [30], plus costs and interest, and any other costs this Court deems is fair.

## COUNT 2: INVASION of PRIVACY

178.    Plaintiff realleges as though fully set forth at length, and incorporates herein by reference, all of the allegations in ¶¶ 1-177 and statements made above and contained herein.

179.    Defendant Noble Park Properties, LLC is a shell company and alter ego of the individual defendants, Hoying and Crawford, who act in unison as co-owners and co-managers. Therefore, allegations in this Count apply to all Defendants.

180.    All Defendants are responsible for their agent, Shaner Group, that staffs and manages the property called Hilton Home2 Suites in Dublin, Ohio. "Hilton Domestic Operating Company Inc. or its subsidiaries" and/or "Hilton Worldwide Holdings Inc.," are also agents and/or joint venture partners of/with Defendants.

181.    In Ohio law, the statute of limitations for invasion of privacy (an intentional tort) is four years. See O.R.C. 2305.09(D). In Florida law also, the statute of limitations for invasion of privacy (an intentional tort) is four years. See Florida Statute, Title VIII, Chapter 95, Section 11 (2021).

182.    In *Housh v. Peth* (1956), 165 Ohio St. 35, 59 O.O. 60, 133 N.E.2d 340, the Ohio

---

[30] A dollar amount found to be reasonable in a similar case of *Andrews v. Marriott*, Case No. 11c4831 Circuit Court for Davidson County, Tennessee, 2011

Supreme Court first recognized a cause of action for invasion of privacy. The court listed

three instances in which the claim could be brought: "An actionable invasion of the right of

privacy is [1] the unwarranted appropriation or exploitation of one's personality, [2] the

publicizing of one's private affairs with which the public has no legitimate concern, or [3]

<u>the wrongful intrusion into one's private activities in such a manner as to outrage or cause</u>

<u>mental suffering, shame or humiliation to a person of ordinary sensibilities.</u>"

183.    The Ohio Supreme Court has later relied upon the "Restatement of Torts" to define

invasion of privacy.

> "Restatement of the Law, Second, Torts, § 652 Copyright (c) 1977,
> The American Law Institute §652 B Intrusion Upon Seclusion
>
> One who intentionally intrudes, physically or otherwise, upon the
> solitude or seclusion of another or his private affairs or concerns, is
> subject to liability to the other for invasion of his privacy, if the
> intrusion would be highly offensive to a reasonable person.
>
> Comments:
> a. The form of invasion of privacy covered by this Section does
> not depend upon any publicity given to the person whose interest is
> invaded or to his affairs. It consists solely of an intentional
> interference with his interest in solitude or seclusion, either as to
> his person or as to his private affairs or concerns, of a kind that
> would be highly offensive to a reasonable man.
> b. The invasion may be by physical intrusion into a place in which
> the plaintiff has secluded himself, <u>as when the defendant forces his
> way into the plaintiff's room in a hotel</u> or..." *Jackson v. Playboy
> Enterprises, Inc.*, 574 F. Supp. 10 (S.D. Ohio 1983).

184.    Therefore, this tort perfectly applies to the instant SAC. Defendants "forced their

way into Plaintiff's hotel room" just as the "Restatement" treatise explicitly defines.

185.    The 11th Cir. recognizes this "Restatement" as law. In *Phillips v. Smalley Maint.*

*Servs., Inc.*, 711 F.2d 1524, 1533 (11th Cir. 1983), "Does the law of the State of Alabama

recognize the tort of invasion of privacy in the form described in § 642B, *Restatement*

*(Second) of Torts* (1977) and set forth below?... *Restatement (Second) of Torts,* § 652B, and

its Comment, enunciate a clear and concise definition, and establish the perimeter, of the "wrongful intrusion" tort, which, when read in light of our own case law, affords meaningful guidelines for the adjudication of such actions as alleged by the instant Plaintiff. Consequently, we answer the Court of Appeals' first inquiry in the affirmative."

186. Defendants (Robert Hoying, Brent Crawford, and Noble Park Properties LLC), acting as the "principle" employers, individually, and by and through its agents and/or joint venturers, had a duty to exercise reasonable and ordinary care, and caution in and about the ownership, management, maintenance, supervision, control and operation of the Dublin, Ohio "Home2 Suites" and its reservation system and each of its employees, agents, servants and independent contractors, all to the benefit of guests, patrons, business invitees, and persons like Plaintiff.

187. Defendants, by and through their agents, employees, servants, and/or independent contractors, were negligent in their acts and/or omissions by allowing incompetent managers to run the business operations resulting in a breaking and entering of Plaintiff's hotel room while he was in bed and undressed, as a female employee stood and witnessed the actions (see ¶¶ 84-90).

188. Defendants had no legal right to enter Plaintiff's room. There was no emergency reason to open Plaintiff's door either. "Single-occupancy hotel rooms are meant as a private refuge" and hotel employees entering guests rooms has been ruled to be invasion of privavcy. See, for examples, *Sowards v. Norbar, Inc.*, 78 Ohio App. 3d 545, 605 N.E.2d 468 (Ct. App. 1992)., and *Lynn v. Allied Corp.*, 41 Ohio App. 3d 392, 536 N.E.2d 25 (Ct. App. 1987).

189. The intrusions by Defendants were and are objectionable and offensive to any reasonable person or jury. This element is to be determined by a jury.

190.     As set forth above, the intrusions by Defendants were specific to Plaintiff's private information and private matters (i.e., his private apartment dwelling).

191.     As a direct and proximate result of the intrusion of seclusion and invasion of privacy by Defendants, Plaintiff has suffered and continues to suffer from, including but not limited to, severe and permanent emotional distress, embarrassment, and a loss of earning capacity.

192.     WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants in an amount in excess of $2,000,000 [31], plus costs and interest, and any other costs this Court deems is fair.

## COUNT 3: BREACH of CONTRACT

193.     Plaintiff realleges as though fully set forth at length, and incorporates herein by reference, all of the allegations in ¶¶ 1-192 and statements made above and contained herein.

194.     Defendant Noble Park Properties, LLC is a shell company and alter ego of the individual defendants, Hoying and Crawford, who act in unison as co-owners and co-managers. Therefore, allegations in this Count apply to all defendants Hoying, Crawford, Noble Park, Shaner, and Larson.

195.     Crawford, Hoying, and Noble Park are responsible for their agents, Shaner and Larson, who staff and manage the property called Hilton Home2 Suites in Dublin, Ohio. "Hilton Domestic Operating Company Inc. or its subsidiaries" and/or "Hilton Worldwide Holdings Inc.," are also agents and/or joint venture partners of/with Defendants. [32]

### Which State Contract Law Should be Applied?

196.     There was no clause or term in the explicit contract between Plaintiff and Defendants

---

[31] A dollar amount found to be reasonable in a similar case of *Andrews v. Marriott*, Case No. 11c4831 Circuit Court for Davidson County, Tennessee, 2011
[32] Florida residents can also make reservations with Defendants through other travel Internet companies, such as Expedia, rather than go through the Hilton reservation system. In this instant case, Plaintiff used the Hilton system.

that specified the prevailing law to be applied in case of a dispute. Therefore, this Court will apply the Erie Doctrine.

197.    Favoring the application of Florida contract law is the fact that Plaintiff was domiciled in Florida when the contract was made, and Defendants knew that when the hotel reservation was made. Favoring the application of Ohio contract law is that the services to be provided were in Ohio.

**The Elements of a Contract**

198.    Florida and Ohio law define the elements of a valid contract as 1) Offer, 2) Mutual Consent, 3) Consideration (i.e., money), and the 4) Legality of the contract terms.[33] The parties must also have legal capacity to agree to a contract and the contract must be conscionable to be enforceable.

**The Express Contract**

199.    An express written contract was formed on February 7th, 2022 after Plaintiff reserved the room for five days. The terms of the contract were delivered via email (Ex. 1).

200.    Plaintiff was offered the terms of the contract via the Hilton reservation system (¶ 66 and Ex. 1). The consideration was the hotel fee. Plaintiff fulfilled that element when he paid for the first week in advance (see ¶ 71 and Ex. 1), and then paid in full every week thereafter (Id). Payments totaled at least $21,692 for the stay that lasted from February of 2022 through September of 2022. Mutual consent occurred when Defendants accepted Plaintiff's money and allowed him to check in to the hotel, then continued accepting payments. Creating a contract for a hotel stay is a legal act.

201.    That express written contract makes no mention of Defendants. Only "Hilton" and

---

[33] Of note, Florida is the only state to have a quirky "material breach" component, but other federal courts have been unable to understand it. See Florida Bar Journal Vol. 90, No. 3, March 2016, Pg 36

"Hilton Domestic Operating Company Inc. or its subsidiaries" are spelled out. However, because those Hilton entities are agents and/or joint venture partners with (Crawford, Hoying, Noble Park), and Plaintiff paid those defendants in person when he physically checked in (as opposed to paying Hilton via the Internet), that makes Defendants also part of the express contract and obligated to uphold the terms of the contract.

**The Implied Contract**

202.    Plaintiff stayed approximately seven months, or long past the five days of the express written contract. The local Dublin property, through Defendants' Shaner agents managing it, took Plaintiff's payments via credit card approximately every two weeks, for a daily rate of approximately $100. Plaintiff was never asked to sign any new express contracts. By accepting payment and providing services, an implied contract with the same terms as the express contract was made with Defendants.

**Definition of Breach of Contract**

203.    In Florida, *FWF, INC. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342 (S.D. Fla. 2007) *inter alia* define breach as, "The elements of a breach-of-contract claim are: (1) a valid contract; (2) a material breach; and (3) damages."

204.    In Ohio, *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St. 3d 415, 650 N.E.2d 863, 1995 Ohio 61 (1995), *inter alia* define breach as, "To prove a breach of contract claim, a plaintiff must show "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Nilavar*, supra, at 483, 738 N.E.2d 1271, quoting *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 600, 649 N.E.2d 42."

**How the Contract was Breached**

205.    Nowhere in the contract process (i.e., neither expressly (Ex. 1) nor implied) did Plaintiff consent to searches of, or intrusions into, his room by hotel staff with no advanced

notice. Nowhere in the contract was Plaintiff notified that housekeeping would not clean the room daily.

206.    Plaintiff rightly had an expectation of the hotel to clean the room and change the bed linen daily. It is standard industry practice and it is codified in Ohio law. O.R.C. Section 3731.12(A) "Beds and bedding" states, "…All sheets and pillow slips used on any furniture designed for sleeping shall be white or off-white in color and shall be washed daily if requested by a guest…" Section 3731.13 states, "All bedding used in any hotel must be thoroughly aired, disinfected, and kept clean…"

207.    There were never special Ohio laws passed during the COVID era to exempt Defendants from cleaning the room. *Arguendo*, even if there were, the Ohio Department of Health rescinded all COVID orders in 2021, long before Plaintiff checked in the next year in 2022.[34, 35]

208.    Plaintiff rightly had an expectation of the hotel having clean carpets. It too is the law. O.R.C. Section 3731.13 states, "…All floors, carpets, and equipment in hotels, and all walls and ceilings shall be kept in sanitary condition."

209.    Plaintiff rightly had an expectation of privacy in his room. "[T]he Fourth Amendment protection against unreasonable searches and seizures is not limited to one's home, but also extends to such places as hotel or motel rooms.'" *State v. Oliver*, 2018-Ohio-3667, 112 N.E.3d 573, ¶ 31 (8th Dist.), quoting *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir.2004). (Additional quotations omitted.) Thus, "[a] registered hotel guest has a reasonable expectation of privacy in his room under the Fourth Amendment." *Oliver*. While the Fourth Amendment applies to protections against police (i.e., the government) illegally

---

[34] https://odh.ohio.gov/media-center/odh-news-releases/odh-news-release-06-02-21
[35] COVID was, and still is, used as a pretext for hotels to cut costs by hiring fewer staff to perform fewer services. https://www.cbsnews.com/news/hotels-end-basic-amenities-no-more-housekeeping-skimpflation/

searching hotel rooms, the logic used in court decisions explains why people have an expectation of privacy against any form of intrusion into a hotel room.

210.   Defendants breached the contract by not providing a safe and private hotel room. Instead, they provided incompetent services by negligent and incompetent hotel staff (see ¶¶ 76, 80-83) who illegally entered Plaintiff's room (see ¶¶ 84-90) and ended his extended-stay with a demand that Plaintiff leave. Defendants had no justification for demanding Plaintiff to leave.

211.   Defendants breached the contract by not cleaning the room and bed linen daily. (see ¶¶ 77-78). By not doing so, they violated O.R.C. Section 3731.12(A) and 3731.13. By violating the law, they also breached the contract.

212.   Defendants breached the contract by not providing clean and sanitary carpets. (see ¶ 78). By not doing so, they violated O.R.C. Section 3731.13. By violating the law, they also breached the contract.

213.   Defendants also breached the contract by failing to tell Plaintiff that his stay would be limited to 270-days (see ¶ 73). Home2 Suites is advertised as an extended-stay hotel, complete with a kitchen. No limitation to length of stay was ever specified or implied. Defendants accepted payment after payment from Plaintiff (Ex. 1) without ever suggesting that his stay was limited. Therefore, Plaintiff was "offered" an extended-stay hotel as part of the contract and those services were not provided.

214.   Plaintiff was also forced to leave sooner than he otherwise would have chosen (see ¶ 104), meaning that the hotel did not provide the extended-stay that was advertised.

215.   Had Plaintiff known that he could not stay indefinitely, he might have moved into a normal apartment or different hotel given his large amount of personal belongings rather than forming the contract.

216.    Defendants also breached the contract by failing to tell Plaintiff that the property in which he was staying was not owned or operated by Hilton. The reservation system and signage all state "Hilton" and not Noble Park. Hilton operates the particular Internet reservation system used by Defendants, acting as their agent and/or joint venture partner, but the property and Shaner staff are not Hilton.[36] There is a material difference in quality of property between a flagship Hilton-operated property and one like Defendants' have.

217.    Plaintiff suffered damages by paying for a service that he did not receive. His hotel room was not cleaned per the law, nor was the carpeting. His move to a different hotel was a considerable undertaking. The invasion of privacy also caused Plaintiff to suffer damages.

218.    Plaintiff was unable to easily move and find a better hotel because he had a large amount of personal belongings with him equivalent to a studio apartment. U.S. Mail was also being forwarded to him. It was not as simple as checking out and taking his business elsewhere. Plaintiff was overwhelmed with the care of his elderly father with dementia that required Plaintiff to drive 60-miles roundtrip each day, at least, and act as the primary caregiver. Uprooting from his room was not an easy option.

219.    WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants in an amount in excess of $23,000 plus costs and interest, and any other costs this Court deems is fair.

---

[36] The email from Hilton executives to Plaintiff (see ¶¶ 126), which contained an attached letter sent from Hilton to Defendants, establishes the agent and/or joint venture partner relations of Hilton.

## COUNT 4: OHIO CSPA VIOLATION

(Ohio R.C. §1345.02 Consumer Sales Practices Act.- Unfair or Deceptive Act)

220.    Plaintiff realleges as though fully set forth at length, and incorporates herein by reference, all of the allegations in ¶¶ 1-219 and statements made above and contained herein. Specific allegations are listed by paragraph below to comply with the Order.

221.    Defendant Noble Park Properties, LLC is a shell company and alter ego of the individual defendants, Hoying and Crawford, who act in unison as co-owners and co-managers. Therefore, allegations in this Count apply to all Defendants.

222.    All Defendants are responsible for their agent, Shaner Group, that staffs and manages the property called Hilton Home2 Suites in Dublin, Ohio. "Hilton Domestic Operating Company Inc. or its subsidiaries" and/or "Hilton Worldwide Holdings Inc.," are also agents and/or joint venture partners of Defendants.

223.    Defendants (Robert Hoying, Brent Crawford, and Noble Park Properties LLC), acting as the "principle" employer, individually, and by and through its agents and/or joint venturers, committed an unfair and deceptive act in its consumer transaction with Plaintiff in violation of Ohio R.C. §1345.02 Consumer Sales Practices Act ("CSPA").

224.    Specifically, Defendants represented to Plaintiff that they would provide a safe and private hotel room for an extended-stay because the property was presented as a trusted Hilton property (see ¶ 66 and Ex. 1). In fact, the "hotel" was not owned or operated by Hilton. The so-called "Hilton" property was actually Defendants' property (see ¶¶ 30, 34) managed by their agent Shaner, and offered to Plaintiff as a bait-and-switch scam.

225.    Defendants, through their agent Shaner, provided multiple incompetent managers, one of whom was fired (see ¶ 81), and another of whom illegally broke into Plaintiff's apartment (see ¶¶ 84-90).

44

226.    Defendants, through their agent Shaner, did not provide the legally required clean rooms (O.R.C. Section 3731.12(A) "Beds and bedding", [37] (see ¶¶ 77-79) and carpets (O.R.C. Section 3731.13, see ¶ 78), violating Ohio law.

227.    Hence, Defendants violated the "deceptive" section of Ohio R.C. §1345.02(B)(2), "That the subject of a consumer transaction has…performance characteristics…or benefits that it does not have".

228.    Defendants were also unfair and deceptive when they engaged The Cincinnati Insurance Company, which led to that insurance company calling Plaintiff and investigating, and then stating in writing that the entire insurance claim was initiated Plaintiff when it was not. When asked directly, the lawyer at the time for Defendants, Kessler, denied any involvement, which was a lie and deceptive. An emailed cease-and-desist letter (see ¶ 135) demanding that the insurance denial letter be corrected went ignored, further violating the CSPA requirement to make amends when demanded.

229.    As a result of Defendants' violation of §1345.02, Plaintiff has suffered actual economic damages of more than $22,000, (i.e., that being the amount paid for the long-term stay). The CSPA allows Plaintiff to recover three-times those actual damages.

230.    WHEREFORE, Plaintiff prays for judgment in his favor and against Defendants in an amount in excess of $69,000 plus costs and interest, and any other costs this Court deems is fair.

---

[37] O.R.C. Section 3731.12(A) "Beds and bedding" states, "…All sheets and pillow slips used on any furniture designed for sleeping shall be white or off-white in color and shall be washed daily if requested by a guest…" Section 3731.13 states, "All bedding used in any hotel must be thoroughly aired, disinfected, and kept clean…" There were never special Ohio laws passed during the COVID era to exempt Defendants from cleaning the room. *Arguendo*, even if there were, the Ohio Department of Health rescinded all COVID orders in 2021, long before Plaintiff checked in the next year in 2022. O.R.C. Section 3731.13 states, "…All floors, carpets, and equipment in hotels, and all walls and ceilings shall be kept in sanitary condition."

## COUNT 5: CIVIL RICO VIOLATION
### (The RICO Act, 18 U.S.C. §§ 1961–1968)

231.    Plaintiff realleges as though fully set forth at length, and incorporates herein by reference, all of the allegations in ¶¶ 1-230 and statements made above and contained herein. Specific allegations are listed by paragraph below to comply with the Order.

232.    The Racketeer Influenced and Corrupt Organizations Act ("RICO"), at 18 U.S.C. § 1961(1) under "definitions", defines "racketeering activity" with a long list of actions that are predicate acts required to trigger a violation. Extortion is one of those racketeering activities.

### Extortion as a Predicate Act in General

233.    Extortion is not actually defined in the RICO statute. The elements of extortion are defined in The Hobbs Act 18 U.S.C. § 1951(b)(2) as, "The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

### How Predicate Acts Trigger a RICO Violation in General

234.    The commission of a single predicate act listed in 18 U.S.C. § 1961(1) does not trigger a violation of RICO. In 18 U.S.C. § 1962, it defines how predicate acts must occur before rising to the level of RICO. To summarize in plain language:

> (a) A person uses money earned from illegal activities (like organized crime or collecting illegal debts) to buy into, start, or run a business that operates across state or international lines.

> (b) A person gains or keeps control of a business that operates across state or international lines by using illegal activities or collecting illegal debts.

> (c) A person works for or be involved with a business that operates across state or international lines and use illegal activities or illegal debt collection to run its operations.

> (d) Two or more persons conspire with others to do any of the above.

46

235.    A "person" is defined by 18 U.S.C. § 1961(3) as, "…includes any individual or entity capable of holding a legal or beneficial interest in property;"

236.    Defendants Nassetta, Larson, Crawford, and Hoying are persons who work for businesses that "operate across state lines".

**The Pattern of Racketeering Required to Violate RICO**

237.    The RICO provision stating that predicate acts must consist of more than one act within a 10-year period is found in 18 U.S.C. § 1961(5), "pattern of racketeering activity requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

238.    Then, in 18 U.S.C. § 1962, the words "pattern of racketeering activity" are part of the unlawful "prohibited" activities.

239.    Defendants Nassetta, Larson, Crawford, and Hoying are persons who work for businesses that "operate across state lines" and committed more than one act of extortion within 10-years (see sections below), with a likelihood of committing future extortion given that it is their business model.

240.    The predicate acts of extortion, detailed below, were related in the pattern of using extortion to force out certain hotel guests. They were distinct acts in that the victims were unrelated an in different states, or across state lines. The predicate acts involve enterprises. The extortion scheme is ongoing.

241.    Civil complaints using RICO often fail when courts determine that crimes were not separate acts, but rather were bundled together as a single act. Multiple victims are often required, per case law. That is not the case here. The extortion committed in other Hilton hotels were unrelated to Plaintiff, but were part of the same pattern.

**Defendants' Extortion Rises to RICO Violations**

242.     In this instant case, Defendants Nassetta, Larson, Crawford, and Hoying meet the definition of "person". They are individuals capable of holding a legal or beneficial interest in property.

243.     Defendants Hilton, Shaner, and Noble Park meet the definition of "enterprise". They are business entities (i.e., Inc. LP, and LLC).

244.     Defendants Nassetta, Larson, Crawford and Hoying are persons who own and/or control the hotels (i.e., enterprise) that cross state lines (i.e., § 1962(b)). The managers of the hotels work for the racketeering enterprise (i.e., § 1962(c)). All of them conspire with each other to commit the predicate act of extortion, *inter alia* (i.e., § 1962(d)).

245.     For the elements of RICO pattern (i.e., §1961(5)), multiple acts of extortion were committed to multiple victims within a 10-year timeframe. These were:

**Predicate Act #1**

246.     Extortion to Plaintiff- This act is detailed above (¶¶ 84 - 90 and 108 - 120). Plaintiff was extorted to leave his extended-stay room at the Dublin, Ohio Hilton, managed by Shaner, and owned by Crawford, Hoying, and Noble Park. Defendants intentionally entered his room without notifying him ahead of time, and then made frivolous calls to police, etc. There was no legitimate reason for any of this. It was all done to further the enterprises they own/manage/work. The extortion was part of a conspiracy to dodge legal means to remove tenants, as explained in the CoStar "how to" guide to committing RICO.

**Predicate Act #2**

247.     Extortion to the Hilton hotel guest in the Amarillo, Texas Hilton- This act is detailed above (¶¶ 121 - 125). That victim, described in the Twitter post, was also extorted to leave his extended-stay room at the Texas Hilton (also a "Home2 Suites by Hilton" as was the

case with Plaintiff). Defendants there too intentionally entered his room without notifying him ahead of time. There was no legitimate reason for doing so. It was all done to further the enterprises they own/manage/work. The extortion was part of a conspiracy to dodge legal means to remove tenants, as explained in the CoStar "how to" guide to committing RICO.

**Predicate Act #3**

248.    Extortion to the Hilton hotel guest in the Nashville Hilton- This act is detailed above (¶¶ 124 - 125). That extortion victim was forced to leave after the manager entered the guest's room.

**The CoStar Report Proving the Motive of the Extortion**

249.    Plaintiff believes those predicate acts are just the tip of the extortion iceberg. Discovery will yield exponentially more examples. His belief is based on the existence the CoStar report (¶¶ 108 - 116), which was widely disseminated to the Hilton-affiliated hotels.

250.    The premeditated purpose of the extortion was to avoid having to use landlord-tenant court, or other legitimate means of recourse, to remove problematic tenants. Instead, Defendants took plays out of the organized crime playbook and used good-old-fashioned extortionary tactics. (i.e., shocking people by entering rooms unannounced, calling local police, etc.)

251.    The entire scheme is spelled out in black and white by the infamous CoStar article. The CEO of Hilton, Nassetta, is on the board of directors of CoStar.

252.    The evidence for extortion and RICO violations is beyond a reasonable doubt (i.e., sufficient for a criminal matter). However, only a preponderance of the evidence is required in this civil matter.

253.    Therefore, Defendants are liable for violating Civil RICO by committing extortion. They also conspired, which is illegal.

**Defendants' Conspiracy to Extort Rises to a RICO Violation:**

254.    The conspiracy clause of RICO, per 18 U.S.C. § 1962(d), states, "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

255.    A RICO conspiracy does not require the actual commission of predicate acts. Only an agreement to further the enterprise's racketeering objectives with knowledge and intent is required (*Salinas v. United States*, 522 U.S. 52 (1997)).

256.    Direct evidence of an express agreement is not required to prove a RICO violation of conspiracy. In *Howard v. America Online Inc.*, 208 F.3d 741 (2000), the agreement can be inferred from circumstantial evidence, such as interdependent actions or communications, without needing an express pact.

257.    RICO does not explicitly define "conspiracy". The definition of conspiracy is derived from the federal conspiracy statute and judicial interpretations. 18 U.S.C. § 371 states, "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

258.    Defendant Nassetta conspired to extort by being aware of and approving the CoStar report. He is on the board of CoStar. His Hilton properties under his control, such as the ones listed in the acts of extortion, then followed the CoStar recommendations, a reasonable jury would infer (i.e., inference is allowed per *Howard v. America Online Inc.*,).

259.    Those Hilton properties are managed or owned by the other defendants of Larson, Crawford, and Hoying. They interact extensively with the Hilton company staff (i.e., Nassetta and his agents who manage the Hilton franchise operations). The agreement is

again reasonably inferred by the Hilton CEO approving the CoStar report and then those same types of actions being witnessed in multiple Hilton locations. It was not likely by mere chance.

260. Hence, all of the persons who are defendants conspired to violate extortion laws to generate money for their enterprises.

**The Damages to Plaintiff's Business or Property**

261. In 8 U.S.C. § 1964, it mentions the types of injuries that allow a person to sue under RICO. They are, "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee..."

262. Because the damages must have occurred to business or property, as opposed to personal injury to the plaintiff, normal tort damages of mental anguish, etc. are not allowed, per case law. However, that is not codified in the RICO statute.

263. Case law has imposed qualifiers to limit the scope of civil RICO: A) Damages must be actual and not speculative, and B) must be directly caused by the defendant's unlawful actions.

264. However, The Supreme Court, in April of 2025 (*Medical Marijuana, Inc. v. Horn*), allowed personal injuries that lead to damages to business or property to be acceptable forms of damages in RICO. "This ruling could have major consequences for product sellers and manufacturers by exposing them to RICO liability for conduct that once gave rise to typical state-law claims."[38]

---

[38] https://www.winston.com/en/blogs-and-podcasts/product-liability-and-mass-torts-digest/supreme-court-opens-door-to-civil-rico-claims-arising-from-personal-injury

**Plaintiff's Damages Applicable to RICO Statute**

265.    Plaintiff suffered <u>damages to his hotel rights, which case law considers to be property</u>, and this property is part of his business operations.

266.    The contracted right to use the hotel room at the Dublin Hilton was Plaintiff's property. He was conducting his business from that room (i.e., he managed his stock account and his concierge medical business).

267.    The cost Plaintiff paid to Defendants to stay for 215 days (from 2/16/2022 to 9/18/2022) at the Dublin Hilton, which totaled $23,131,[39] was for a business asset that was damaged by the extortion.

268.    Not only was the actual hotel stay ruined, but Plaintiff also lost the right to future use after being extorted to leave the hotel. Since Plaintiff eventually left Ohio on 1/11/2023, or 115 days after leaving the Dublin Hilton, that lost value is $12,371, prorated at $107 per day.

269.    Plaintiff also suffered <u>damages to his stock trading business</u>. Plaintiff is a professional investor with a history of working for the largest banks and hedge funds. He now manages his own assets. In the year 2022, Plaintiff was routinely making more than $100,000 per day by trading stocks in his account. From the period of 9/12/2022 to 9/18/2022, when Defendants entered his hotel room and then when Plaintiff as extorted to leave, he was unable to properly manage his portfolio and it suffered, or underperformed. Plaintiff estimates the lost revenue to be $120,000 based on performance before and after that time period.

270.    Plaintiff also suffered damages in the cost to prepare this lawsuit, per 18 U.S.C. §

---

[39] The invoice sent to Plaintiff shows $21,087.00 paid for stating from 2/16/2022 through 8/30/2022, or 196 days, but Plaintiff actually left the Hilton on 9/18/2022. That extra payment of $2,044 totals $23,131.

1964(c), "cost of the suit, including a reasonable attorney's fee"

## JURY DEMAND

271.   Plaintiff requests a trial by a jury of his peers.

## RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against all Defendants, jointly and severally, as follows:

**On Count 1 (Negligence),** judgment in favor of Plaintiff in the amount of $2,000,000, together with reasonable attorney's fees, costs, and expenses incurred in prosecuting this action.

**On Count 2 (Invasion of Privacy),** judgment in favor of Plaintiff in the amount of $2,000,000, together with reasonable attorney's fees, costs, and expenses incurred in prosecuting this action.

**On Count 3 (Breach of Contract),** judgment in favor of Plaintiff in the amount of $23,000, plus pre- and post-judgment interest as permitted by law, reasonable attorney's fees, costs, and expenses incurred in prosecuting this action.

**On Count 4 (CSPA Violation),** judgment in favor of Plaintiff in the amount of $69,000, plus pre- and post-judgment interest as permitted by law, reasonable attorney's fees, costs, and expenses incurred in prosecuting this action.

**On Count 5 (RICO Violation),** judgment in favor of Plaintiff in the amount of $300,000, inclusive of treble damages, costs, and reasonable attorney's fees as provided under 18 U.S.C. § 1964(c).

**Such other and further relief** as the Court deems just and equitable, including, but not limited to, any injunctive or equitable remedies available under 18 U.S.C. § 1964 or other applicable law.

Respectfully submitted,

Steven Greer, *pro se*
Phone (212) 945-7252
steve@greerjournal.com